IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Action No. 12-cv-00986-PAB

MANUEL R. MARTINEZ,

        Plaintiff,

v.

CAROLYN W. COLVIN, Acting Commissioner of Social Security,

        Defendant.

---

## ORDER

---

This matter is before the Court on plaintiff Manuel R. Martinez' complaint [Docket No. 1], filed on April 13, 2012. Plaintiff seeks review of the final decision of defendant Carolyn W. Colvin (the "Commissioner") denying plaintiff's claim for disability insurance benefits and supplemental security income under Titles II and XVI of the Social Security Act (the "Act"), 42 U.S.C. §§ 401-33 and 1381-83c.[1] The Court has jurisdiction to review the Commissioner's final decision under 42 U.S.C. § 405(g).

## I. BACKGROUND

On February 8, 2010, plaintiff applied for disability benefits under Title II and Title XVI of the Act. R. at 10. Plaintiff alleged that he had been disabled since November 12, 2008. *Id*. After an initial administrative denial of his claim, plaintiff received a hearing before an Administrative Law Judge ("ALJ") on May 19, 2011, at which his

---

[1] The Court has determined that it can resolve the issues presented in this matter without the need for oral argument.

attorney appeared, but he did not. *Id*. On June 21, 2011, the ALJ issued a decision

denying plaintiff's claim. *Id*. at 24.

The ALJ found that plaintiff had the following severe impairments: "degenerative

disc disease of the lumbar and thoracic spine, degenerative joint disease of the knees

and hips, obesity, and hypertension." R. at 13. The ALJ found that these impairments,

alone or in combination, did not meet one of the regulations' listed impairments, *id*. at

17, and ruled that plaintiff had the residual functional capacity ("RFC") to

> "perform light work as defined in 20 C.F.R. § 404.1567(b) and 416.967(b)
> except he can only occasionally climb ramps/stairs, stoop, kneel, crouch,
> crawl, and climb ladders, ropes, or scaffolds. Moreover, he can only
> frequently balance.

R. at 17-18. Based upon this RFC and in reliance on the testimony of a vocational

expert ("VE"), the ALJ concluded that "[t]he claimant is capable of performing past

relevant work as a fast food worker, sales attendant, and collections clerk." R. at 23.

The Appeals Council denied plaintiff's request for review of this denial. R. at 1.

Consequently, the ALJ's decision is the final decision of the Commissioner.

## II. ANALYSIS

### A. Standard of Review

Review of the Commissioner's finding that a claimant is not disabled is limited to

determining whether the Commissioner applied the correct legal standards and whether

the decision is supported by substantial evidence in the record as a whole. *See Angel*

*v. Barnhart*, 329 F.3d 1208, 1209 (10th Cir. 2003). The district court may not reverse

an ALJ simply because the court may have reached a different result based on the

record; the question instead is whether there is substantial evidence showing that the

ALJ was justified in her decision.  *See Ellison v. Sullivan*, 929 F.2d 534, 536 (10th Cir. 1990).  "Substantial evidence is more than a mere scintilla and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Flaherty v. Astrue*, 515 F.3d 1067, 1070 (10th Cir. 2007).  Moreover, "[e]vidence is not substantial if it is overwhelmed by other evidence in the record or constitutes mere conclusion."  *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992).  The district court will not "reweigh the evidence or retry the case," but must "meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met."  *Flaherty*, 515 F.3d at 1070.  Nevertheless, "if the ALJ failed to apply the correct legal test, there is a ground for reversal apart from a lack of substantial evidence."  *Thompson v. Sullivan*, 987 F.2d 1482, 1487 (10th Cir. 1993).

## B.  The Five-Step Evaluation Process

To qualify for disability benefits, a claimant must have a medically determinable physical or mental impairment expected to result in death or last for a continuous period of twelve months that prevents the claimant from performing any substantial gainful work that exists in the national economy.  42 U.S.C. § 423(d)(1)-(2).  Furthermore,

> [a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A) (2006).  The Commissioner has established a five-step

3

sequential evaluation process to determine whether a claimant is disabled.  20 C.F.R.

§ 404.1520; *Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988).  The steps of the

evaluation are:

> (1) whether the claimant is currently working; (2) whether the claimant has
> a severe impairment; (3) whether the claimant's impairment meets an
> impairment listed in appendix 1 of the relevant regulation; (4) whether the
> impairment precludes the claimant from doing his past relevant work; and (5)
> whether the impairment precludes the claimant from doing any work.

*Trimiar v. Sullivan*, 966 F.2d 1326, 1329 (10th Cir. 1992) (citing 20 C.F.R.

§ 404.1520(b)-(f)).  A finding that the claimant is disabled or not disabled at any point in

the five-step review is conclusive and terminates the analysis.  *Casias v. Sec'y of*

*Health and Human Servs.*, 933 F.2d 799, 801 (10th Cir. 1991).

The claimant has the initial burden of establishing a case of disability.  However,

"[i]f the claimant is not considered disabled at step three, but has satisfied her burden of

establishing a prima facie case of disability under steps one, two, and four, the burden

shifts to the Commissioner to show the claimant has the residual functional capacity

(RFC) to perform other work in the national economy in view of her age, education, and

work experience."  *See Fischer-Ross v. Barnhart,* 431 F.3d 729, 731 (10th Cir. 2005);

*see also Bowen v. Yuckert,* 482 U.S. 137, 146 n. 5 (1987).  While the claimant has the

initial burden of proving a disability, "the ALJ has a basic duty of inquiry, to inform

himself about facts relevant to his decision and to learn the claimant's own version of

those facts." *Hill v. Sullivan,* 924 F.2d 972, 974 (10th Cir. 1991).

### C.  The ALJ's Decision

Plaintiff argues that the ALJ erred in failing to sufficiently consider his repeated

hospitalizations for depression and in relying on medical opinions that predated his hospitalizations instead of further developing the record to address changes in plaintiff's condition.  Docket No. 15 at 21-26.  The Commissioner counters that the ALJ's determination was reasonable, given the relatively short span of time during which plaintiff was hospitalized, the nature of external causes of his bouts of depression, and the absence of an opinion from a treating source in the record regarding plaintiff's mental health.  Docket No. 16 at 9-18.

The relevant facts are as follows.  From August 2008 through January 2009, plaintiff received treatment from Dr. Brian Bentz, who diagnosed plaintiff with depression, as well as several other unrelated medical conditions, and prescribed anti-depressant medication.  R. at 342, 339, 336, 331.  On December 30, 2009, plaintiff was examined by physician's assistant Marc Williams, who noted that plaintiff suffered from depression and insomnia and was taking antidepressants.  R. at 285.  On July 3, 2010, plaintiff underwent a consultative examination with physician Benjamin Loveridge, who found that plaintiff had "[m]oderately severe depression" and "[s]trongly recommend follow-up and evaluation with potential treatment from the appropriate trained mental health specialist."  R. at 225.  On July 7, 2010, plaintiff underwent a consultative examination with psychologist Brett Valette, who found that plaintiff had "[c]ontinued bereavement" and "[n]onspecific mood disorder, depression" with "mild" psychosocial stressors and a Global Assessment of Functioning ("GAF") score of 65.[2]  R. at 229-32.

---

[2] "The GAF is a 100-point scale divided into ten numerical ranges, which permits clinicians to assign a single ranged score to a person's psychological, social, and occupational functioning."  *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1162 n.1 (10th Cir. 2012) (citing American Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental

On July 29, 2010, state agency physician Ellen Ryan issued an opinion based on a consultative examination of plaintiff stating that he suffered from affective and personality disorders, but was only mildly restricted in maintaining social functioning and mildly restricted in maintaining concentration, persistence, or pace.  R. at 54.  Dr. Ryan further stated that, while plaintiff's depression may cause "some concern," plaintiff was nonetheless "able to think, reason and act on [his] own behalf."  R. at 58.  Dr. Ryan concluded that plaintiff's depression was not severe.  R. at 54.

On November 7, 2010, plaintiff was admitted to Parkview Medical Center ("Parkview") with chest pain and then hospitalized because he expressed suicidal ideation.  R. at 444.  During his stay, he was diagnosed with major depressive disorder and anxiety disorder.  *Id*.  At the time of intake, his GAF score was assessed at 30, indicating "[b]ehavior . . . considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment . . . OR inability to function in almost all areas."  *Id*.; *Keyes-Zachary*, 695 F.3d at 1162 n.1.  He was discharged eleven days later with a GAF score of 55, indicating "[m]oderate symptoms . . . OR moderate difficulty in social, occupational, or school functioning."  R. at 444; *Keyes-Zachary*, 695 F.3d at 1162 n.1.  On December 16, 2010, plaintiff was admitted to Parkview for suicidal ideation, diagnosed with bipolar disorder, and assigned a GAF score of 35.  R. at 426.  He was discharged 2 days later with a GAF score of 50, indicating "[s]erious symptoms . . . OR any serious impairment in social, occupational, or school

---

Disorders 32, 34 (Text Revision 4th ed. 2000)).  A GAF score of 65 indicates "[s]ome mild symptoms . . . OR some difficulty in social, occupation, or school functioning . . ., but generally functioning pretty well, has some meaningful interpersonal relationships."  *Id*.

functioning." R. at 426; *Keyes-Zachary*, 695 F.3d at 1162 n.1. On January 3, 2011,

plaintiff was admitted to Parkview for depression and suicidal ideation and assessed

with a GAF score of 35. R. at 417. He was discharged eight days later with a GAF

score between 45 and 50. R. at 414. On March 19, 2011, plaintiff was admitted to

Parkview Medical Center with depression and suicidal ideation and was found to have a

GAF score between 35 and 40. R. at 398-99. He was discharged five days later with a

GAF score of 60. R. at 396-97. In total, plaintiff spent twenty-six days at Parkview

between November 2010 and March 2011.

The ALJ assessed plaintiff's periods of hospitalization as follows:

> [I]t appears [plaintiff] receives psychiatric treatment from his primary care physician as well as sporadic treatment at the emergency room. For example, from March 19, 2010 to March 24, 2010, the claimant was treated at the emergency room for bipolar disorder, depression, and some suicidal ideation. On admission his GAF score was 35-40 . . . . However, the doctor stressed that he had been non-compliant with the treatment prescribed by his primary care physician and that he did not stay on his medications. The claimant's discharge diagnosis was bipolar disorder (depressed) with a GAF of 60 . . . . Later in November of 2010, the claimant presented to the emergency room with complaints of chest pain, dizziness, shortness of breath, and nausea. . . . His discharge diagnosis was borderline personality traits, anxiety and major depressive disorder, severe, recurrent, with psychiatric features in early partial remission. . . . His GAF was 30 on admission and 55 at discharge. In December of 2010, the claimant again came to the emergency room with complaints of chest pain, and while there, expressed some suicidal ideation. He was assessed with bipolar and given a GAF score of 30 on admission and 55 at discharge. . . . In January and February of 2011 the claimant again appeared at the emergency room, where he was diagnosed with bipolar and depression and assessed with a low GAF score due to alleged suicidal ideation. . . . However, I note that the GAF score can be of limited value when determining disability. . . . Because it is an assessment of the claimant's functioning at a specific point in time and is highly dependent on the claimant's current situation, it may provide a limited indication of the claimant's overall level of functioning over an extended period. For example, in this case, the claimant's psychiatric symptoms in November and December of 2010 were noted to have stemmed from marital difficulties with his wife . . . . when determining functioning, I

> must take a long-term approach.  Because the GAF score reflects a specific
> moment in time and can change rather dramatically in a short period of time
> as the claimant's circumstances change, it can be of limited value in
> determining disability.

R. at 14-15 (internal citations omitted).  The ALJ specifically discussed Dr. Valette's
finding that plaintiff's cognitive abilities were intact; Dr. Valette's observation that,
despite plaintiff's statement that he sits at home all day doing nothing, he "does do
activities and he does work part time"; and plaintiff's own statements that he gets along
well with other people, handles routine well, is able to follow directions, and has no
problems maintaining attention.  R. at 15-16.  The ALJ stated that "the claimant has
experienced no episodes of decompensation, which have been of extended duration."
R. at 16.

In determining plaintiff's RFC, the ALJ stated that she gave great weight to Dr.
Ryan's opinion that plaintiff had only mild mental impairments because she found that
opinion to be consistent with the medical evidence and with Dr. Valette's opinion.  R. at
22.  The ALJ noted that the record did not contain an opinion on plaintiff's mental health
from a treating physician.[3]  *Id*.

### 1.  *Hospitalization and GAF Scores*

Plaintiff argues that the ALJ erred at steps two and three of her analysis in

---

[3] The ALJ also stated that, "in choosing not to appear at the hearing, the claimant
lost an opportunity to provide convincing testimony regarding his allegedly disabling
symptoms and limitations."  R. at 10, 19, 21.  The Court notes that, although the failure
of both a claimant and his attorney to appear at a noticed hearing is grounds for
dismissing a request for a hearing, *see* 20 C.F.R. § 404.957(b), plaintiff's absence in
this case was not dispositive because his attorney appeared on his behalf and the ALJ
proceeded to hold a hearing in his absence.  R. at 10, 29-45; *see also McNatt v. Apfel*,
201 F.3d 1084, 1088 (9th Cir. 2000) ("Under a literal reading of the text, it thus suffices
for either [a claimant] or his attorney to appear.").

determining that plaintiff's depression is not "severe" and does not meet one of the impairments listed at 20 C.F.R. Part 404, Subpart P, Appendix 1.  Docket No. 15 at 21.

An impairment is "severe" if it "significantly limit[s]" a claimant's "physical or mental ability to do basic work activities," 20 C.F.R. § 404.1521(a), and it meets the "duration requirement"–that is, if it lasts or is expected to last for a period of at least twelve months (unless it is expected to result in death).  20 C.F.R. § 404.1509.  To assess the extent to which a mental impairment limits a clamant's ability to function, an ALJ must consider "all relevant evidence to obtain a longitudinal picture" of a claimant's overall functioning.  20 C.F.R. § 404.1520a(c)(1); *see also* 20 C.F.R. § 404.1520(a)(3) ("We will consider all evidence in your case record when we make a determination or decision whether you are disabled.").

In order to meet the listing for "affective disorders," a claimant must experience at least two of the following: "1. Marked restriction of activities of daily living; or 2. Marked difficulties in maintaining social functioning; or 3. Marked difficulties in maintaining concentration, persistence, or pace; or 4. Repeated episodes of decompensation, each of extended duration."  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04(B)(1)-(4).  "Episodes of decompensation are exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning . . . . [They] may be inferred from medical records showing significant alteration in medication; or documentation of the need for a more structured psychological support system," such as hospitalization.  *Id*. at § 12.00(C)(4).  A claimant experiences "[r]epeated episodes of decompensation, each of extended duration," if he has three such episodes within one year, each lasting for at least two weeks.  *Id*.  If a claimant

9

experiences shorter episodes of more frequent duration, an ALJ "must use judgment to determine if the duration and functional effects of the episodes are of equal severity and may be used to substitute for the listed finding in a determination of equivalence." *Id*.

As a general matter, an ALJ must "discuss the evidence and explain why [s]he found that appellant was not disabled at step three." *Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996). However, "an ALJ's findings at other steps of the sequential process may provide a proper basis for upholding a step three conclusion that a claimant's impairments do not meet or equal any listed impairment," even where the ALJ does not discuss all the relevant evidence in her step three analysis. *Fischer-Ross*, 431 F.3d at 733. A reviewing court may thus "supply a missing dispositive finding . . . where, based on material the ALJ did at least consider (just not properly), [the Court] could confidently say that no reasonable administrative factfinder, following the correct analysis, could have resolved the factual matter in any other way." *Id*. at 733-34 (Tenth Circuit precedent does not "require a remand for a more thorough discussion of the listings when confirmed or unchallenged findings made elsewhere in the ALJ's decision confirm the step three determination under review"); *see also Carpenter v. Astrue*, 537 F.3d 1264, 1268 (10th Cir. 2008) ("the ALJ erred by failing to discuss Listing 12.05C [sic], and his findings elsewhere in his decision are inadequate to render that error harmless by unambiguously negating Mrs. Carpenter's claim to satisfy the elements of that listing").

Plaintiff argues that the ALJ erred at step three by disregarding evidence that he

was committed to the hospital for twenty-six days over a period of four months between fall 2010 and spring 2011. Docket No. 15 at 21-27. He further argues that the ALJ erred in neglecting to consider whether these visits were equivalent to repeated episodes of decompensation, as required by listing 12.04. Docket No. 17 at 9-10. Plaintiff contends that, had the ALJ found that he experienced repeated episodes of decompensation, she could reasonably have found that he met the listing for an affective disorder. *Id*. The Commissioner counters that the ALJ properly considered and weighed all of the relevant evidence in arriving at her determination and that there is substantial support in the record for the conclusion that plaintiff's depression did not meet the duration requirement. Docket No. 16 at 13-15. The Commissioner further argues that the ALJ's analysis at steps four and five address any deficiencies in the step three analysis. *Id*.

Contrary to plaintiff's assertions, the ALJ did not disregard his hospitalizations. Although the ALJ incorrectly stated that plaintiff received treatment in the emergency room, *see* R. at 14-15, her decision nonetheless indicates that she considered plaintiff's hospitalizations and low GAF scores at steps two and three of her analysis. Specifically, the ALJ's statements referring to plaintiff's admission and discharge dates reflect her consideration of the fact that plaintiff remained at the hospital for an extended stay on a number of occasions. *See* R. at 14 ("[o]n *admission* his GAF score was 35-40"), ("The claimant was *moved to a psychiatric unit* after expressing suicidal ideation."), ("[h]is *discharge diagnosis* was borderline personality traits"); 15 ("He was assessed with bipolar and given a GAF score of 30 on *admission* and 55 at *discharge*.")

11

(emphasis added).  The ALJ explicitly referenced all but one instance in which plaintiff was hospitalized, the amount of time he spent in the hospital on several visits, and the diagnoses and GAF scores that he received at each visit.  *See id*.  The ALJ considered the findings of the hospital physicians that plaintiff's depression was linked to his marital problems and his failure to remain compliant with his medication.  R. at 14-15, 396, 426, 463.  The ALJ also considered plaintiff's low GAF scores, concluding that they did not evidence a severe impairment because they were subject to rapid improvement and not representative of plaintiff's overall functioning.  R. at 15.  Plaintiff's argument that the ALJ "erred in failing to consider plaintiff's GAF scores," Docket No. 15 at 23-26, is a request that the Court re-weigh the evidence.  This the Court will not do.  In sum, the Court finds no error at step two.

With respect to step three, it is not clear from the ALJ's decision that she used her judgment, as required by the Social Security regulations, to determine whether the "duration and functional effects" of plaintiff's four hospitalizations–which added up to a period of twenty-six days over the course of five months–were of "equal severity" to the listing for affective disorders, a component of which is three episodes of decompensation within one year, each lasting for at least two weeks.  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(C)(4).  The ALJ stated only that plaintiff has experienced no episodes of decompensation that were of extended duration, suggesting that she made a determination based solely on the fact that plaintiff was not hospitalized for a period of two weeks or longer without considering whether the frequency of plaintiff's hospital stays rendered his condition functionally equivalent to the listing.  *See* R. at 16.

Any error at this step, however, was harmless.  *See Fischer-Ross*, 431 F.3d at

731.  The ALJ found that plaintiff had only mild limitations in activities of daily living, maintaining social functioning, and maintaining concentration, persistence or pace.  R. at 13-16.  The ALJ also found that plaintiff's "medically determinable mental impairments of depression, anxiety, and bipolar disorder, considered singly and in combination, do not cause more than minimal limitation in the claimant's ability to perform basic mental work activities."  R. at 13.  In light of these findings, the ALJ could not have found that plaintiff met the listing for affective disorders even if she had found that he experienced repeated episodes of decompensation.  The Court finds no reversible error at step three.

### 2. *Medical Opinions*

Plaintiff contends that the ALJ erred in relying on the opinions of Drs. Valette and Ryan, because they examined him prior to his hospitalizations, instead of obtaining medical opinions that included this new information.  Docket No. 15 at 27-28.  The Commissioner counters that plaintiff's hospitalization record does not undermine the cited opinions, upon which the ALJ was entitled to rely.  Docket No. 16 at 15-18.

Unless the opinion of a treating source is given controlling weight, an ALJ must determine the weight to accord each medical opinion based on a number of factors, including the length of the treatment relationship, frequency of examination, nature and extent of treatment relationship, support for the opinion, consistency with the record as a whole, the physician's specialization, and any other relevant factors.  20 C.F.R. §§ 404.1527(c)(2)-(6).  Included in these factors is a consideration of the "degree to which these opinions consider all of the pertinent evidence in your claim, including opinions of treating and other examining sources."  *Id*. at § 404.1527(c)(3).

13

Although a claimant in a disability proceeding bears the burden of proving his claim, the non-adversarial nature of the process imposes certain responsibilities on an ALJ that are not typically borne by a finder of fact.  Thus, an ALJ must "ensure that an adequate record is developed during the disability hearing consistent with the issues raised." *Hawkins v. Chater*, 113 F.3d 1162, 1164 (10th Cir. 1997) (citation omitted); *see also Henrie v. U.S. Dep't of Health & Human Servs.*, 13 F.3d 359, 361 (10th Cir. 1993) ("The duty is one of inquiry, ensuring that the ALJ is informed about facts relevant to his decision and [learns] the claimant's own version of those facts.") (citation omitted).

If an ALJ cannot obtain the necessary information from a claimant's medical sources, he "may decide to purchase a consultative examination."  20 C.F.R. § 404.1519a(a).  The Commissioner has "broad latitude in ordering consultative examinations."  *Hawkins*, 113 F.3d at 1166.  A consultative examination may be ordered "to resolve an inconsistency in the evidence," "when the evidence as a whole is insufficient to allow" the ALJ to make a determination, or when there is an "indication of a change" in a claimant's condition that is "likely to affect [his] ability to work, [and] the current severity of [the] impairment is not established."  20 C.F.R. § 404.1519a(b).  A claimant establishes the presence of an issue requiring further investigation by submitting "some objective evidence . . . suggesting the existence of a condition which could have a material impact on the disability decision requiring further investigation." *Hawkins*, 113 F.3d at 1167.  "When the claimant has satisfied his or her burden in that regard, it then, and only then, becomes the responsibility of the ALJ to order a consultative examination if such an examination is necessary or helpful to resolve the

14

issue of impairment." *Id*.

The ALJ's duty to develop the record is heightened in the absence of counsel. When a claimant is represented, the "ALJ may ordinarily require counsel to identify the issue or issues requiring further development." *Id*.

Plaintiff relies on *Chapo v. Astrue*, 682 F.3d 1285, 1292 (10th Cir. 2012), for the proposition that the ALJ erred in according great weight to opinions that were issued prior to plaintiff's hospitalizations.  Docket No. 15 at 28.  In *Chapo*, the ALJ accorded great weight to a medical opinion issued prior to a magnetic resonance imaging scan that revealed an objective "skeletal basis" for the plaintiff's complaints of lower back and leg pain.  *Id*.  The court found that the ALJ's reliance on a "patently stale opinion" was "troubling," but the court did not make a "definitive determination" on whether this reliance was grounds, on its own, for remand as the court had already found sufficient reason to remand the matter.  *Id*. at 1293.  The court, however, "encourage[d] the ALJ to obtain an updated exam or report" on remand "to forestall any potential problem."  *Id*.

Plaintiff contends that the ALJ erred in relying on the opinions of Drs. Valette and Ryan instead of obtaining an opinion on plaintiff's mental health inclusive of his hospital stays in the fall of 2010.  Docket No. 15 at 27-30.  The Commissioner responds that the medical opinions relied on by the ALJ are consistent with the other evidence in the record and not undermined by plaintiff's subsequent hospitalizations.  Docket No. 16 at 16-17.

Here, the ALJ did not find that the record evidence was inadequate to support a determination on plaintiff's claim or that plaintiff's hospitalizations called into question

15

the conclusions of Drs. Valette and Ryan.  Rather, she found that the opinions of Drs.

Valette and Ryan were consistent with the record evidence as a whole, including the

subsequent evidence of hospitalization.  The ALJ considered the records from plaintiff's

hospitalizations and found that they did not indicate the presence of a severe

impairment because they were triggered by non-compliance with his prescribed

medication and by discrete family difficulties he was experiencing at the time.  R. at 14,

15.  She concluded that plaintiff's periods of hospitalization, including his GAF scores

upon admission and discharge, did not support a finding that his "long-term" functioning

was severely impaired.  R. at 15.  This conclusion was within her purview to reach, as

this case does not fall within the criteria set forth under 20 C.F.R. § 404.1519a(b) for

ordering a consultative examination.  *See Eacret v. Barnhart*, 120 F. App'x 264, 268

(10th Cir. 2005) ("Ms. Eacret's depression could reasonably be expected to be

temporary because it was often reported, as the ALJ noted, as brought on by transient

circumstances such as her mother's death and disagreements with her daughter.").

Furthermore, plaintiff's counsel did not raise plaintiff's mental health as an area

requiring further factual development before the ALJ.  *See* R. at 44.  Since the need for

further examination was not "clearly established" in the record, the ALJ was entitled to

rely on plaintiff's counsel to "structure and present [plaintiff's] case in a way that

[plaintiff's] claims [were] adequately explored."  *See Hawkins*, 113 F.3d at 1168.

The dicta in *Chapo* is not to the contrary.  In *Chapo*, the court found that the

"relevant medical record obviously underwent material changes in the twenty months

between" the outdated medical report and the ALJ's decision and that the "staleness" of

the report was reflected in the fact that the ALJ included additional limitations in the

16

RFC determination based on the MRI.  682 F.3d at 1292.  In this case, the ALJ specifically considered plaintiff's hospitalizations and found that this evidence was not material to her determination of plaintiff's RFC.  The Court will not re-weigh the evidence to arrive at a different conclusion.  *See Frantz v. Astrue*, 509 F.3d 1299, 1300 (10th Cir. 2007) ("we may neither reweigh the evidence nor substitute our judgment for that of the agency") (citation omitted).

## IV.  CONCLUSION

For the foregoing reasons, it is

**ORDERED** that the decision of the Commissioner that plaintiff Manuel R. Martinez was not disabled is AFFIRMED.

DATED March 14, 2014.

BY THE COURT:

 s/Philip A. Brimmer
PHILIP A. BRIMMER
United States District Judge